## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

SHAWN JAMES WHITCHER,

      Petitioner,

      vs.

ANDREW SAUL,
Commissioner of Social Security,

      Respondent.

Case No.: 1:18-cv-00377-REB

**MEMORANDUM DECISION AND ORDER**

Pending is Shawn James Whitcher's Petition for Review[1] (Dkt. 1), appealing the Social Security Administration's final decision finding him not disabled and denying his claim for disability insurance benefits and supplemental security income. *See* Pet. for Review (Dkt. 1). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

## I. ADMINISTRATIVE PROCEEDINGS

On November 21, 2011, Whitcher ("Petitioner") protectively applied for Title II disability and disability insurance benefits. (AR 14.) He also protectively filed for Title XVI supplemental security income the same day. (*Id.*) Petitioner alleged disability beginning April 16, 2011. (AR 193, 195.) His claims were denied initially on May 1, 2012 and then again on reconsideration on September 7, 2012. (AR 14.) Thereafter, he requested a hearing and he

---

[1] Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted in as the Respondent in this suit. No further action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

**MEMORANDUM DECISION AND ORDER – 1**

appeared and testified at a hearing in Huron, South Dakota on September 10, 2013.  (*Id.*) Administrative Law Judge ("ALJ") Robert Maxwell then issued a written decision on October 30, 2013 in which he denied Petitioner's claims based upon his finding that Petitioner was not disabled within the meaning of the Social Security Act during the period from his alleged onset date through the date of the decision.  (AR 14–24.)

After the Appeals Council denied review (AR 830), Petitioner challenged the denials of his claims in United States District Court in the District of Oregon.  The court reversed the final decision of Respondent and remanded for further administrative proceedings.  (AR 903, 906–926.)  The Appeals Council then remanded to an ALJ to "offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision."  (AR 929–930.)

Petitioner testified at a hearing held January 23, 2018 in Boise, Idaho.  (AR 692). Impartial vocational expert Kent Granat also appeared and testified at the hearing.  (Id.)

On April 25, 2018, ALJ David Willis issued a decision denying Petitioner's claims, once again finding that Petitioner was not disabled within the meaning of the Social Security Act during the period from his alleged onset date through the date of the decision.  (AR 709.)  The letter to Petitioner accompanying the ALJ's decision indicated that Petitioner could file written exceptions to the Appeals Council within 30 days and that the ALJ decision would become final on the 61st day after the date of the notice if he did not do so.  (AR 689, 690.)  It also indicated that after the decision became final, Petitioner would have 60 days to file a new civil action in federal district court.  (AR 690.)  Petitioner did not timely file written exceptions with the Appeals Council, but Petitioner did thereafter timely file this case in United States District Court for the District of Idaho.

**MEMORANDUM DECISION AND ORDER – 2**

Petitioner contends that "[t]he decision denying Petitioner's claim is not in accordance with the purpose and intent of the Social Security Act, nor is it in accordance with the law, nor is it in accordance with the evidence, but contrary thereto and to the facts and against the evidence, in that Petitioner is disabled from performing substantial gainful activity."  Pet. for Review 2 (Dkt. 1).  Petitioner argues that the ALJ erred (1) in finding an RFC which was not supported by substantial evidence; (2) in dismissing Petitioner's statements without providing clear and convincing reasons for doing so; and (3) in improperly dismissing lay witness statements.  *See generally* Pet'r's Mem. (Dkt. 18).  Petitioner asks that the case be reversed and remanded for an immediate award of benefits.  *Id.* at 20.

## II. <u>STANDARD OF REVIEW</u>

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards.  42 U.S.C. § 405(g); *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017).  Findings as to any question of fact, if supported by substantial evidence, are conclusive.  42 U.S.C. § 405(g).  In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence.  *See Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012).  The standard requires more than a scintilla but less than a preponderance (*Trevizo*, 871 F.3d at 674), and "does not mean a large or considerable amount of evidence."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the Court is to review the record as a whole to decide whether it contains evidence that would allow a person of a reasonable mind to accept the

**MEMORANDUM DECISION AND ORDER – 3**

conclusions of the ALJ. *Richardson*, 402 U.S. at 401; *see also Ludwig*, 681 F.3d at 1051. The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Treichler*, 775 F.3d at 1098. Where the evidence is susceptible to more than one rational interpretation, the reviewing court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Ludwig*, 681 F.3d at 1051. In such cases, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *Batson v. Comm'r of Social Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

The decision must be based on proper legal standards and will be reversed for legal error. *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015); *Treichler*, 775 F.3d at 1098. Considerable weight is given to the ALJ's construction of the Social Security Act. *See Vernoff v. Astrue*, 568 F.3d 1102, 1105 (9th Cir. 2009). However, this Court "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

### III. <u>DISCUSSION</u>

**A.    Sequential Process**

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is work activity that is both substantial and gainful. 20 C.F.R. §§ 404.1572, 416.972. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20

**MEMORANDUM DECISION AND ORDER – 4**

C.F.R. §§ 404.1572(a), 416.972(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized.  20 C.F.R. §§ 404.1572(b), 416.972(b).  If engaged in SGA, disability benefits are denied regardless of the claimant's medical condition, age, education, and work experience.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not engaged in SGA, the analysis proceeds to the second step.  Here, the ALJ found that Petitioner did not engage in substantial gainful activity during the period from his alleged onset date of April 16, 2011 through the date of the ALJ's decision.  (AR 694.)

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement.  20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's physical or mental ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe" if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522, 416.922.  If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Here, the ALJ found that, as of the date of his decision, Petitioner had the following severe impairments: "degenerative joint disease of both shoulders; fracture of the right ankle; degenerative disc disease of the cervical spine; depressive, anxiety, and personality disorders."  (AR 695.)

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the

**MEMORANDUM DECISION AND ORDER – 5**

answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet nor equal a listed impairment, his claim cannot be resolved at step three and the evaluation proceeds to step four.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the ALJ found that Petitioner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (AR 695–697.)

In the fourth step of the evaluation process, the ALJ decides whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  20 C.F.R. §§ 404.1545, 416.945.  An individual's past relevant work is work he performed within the last 15 years or 15 years prior to the date that disability must be established, if the work was substantial gainful activity and lasted long enough for the claimant to learn to do the job.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  Here, the ALJ found that Petitioner had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift, carry, push, or pull less than 10 pounds frequently and 20 pounds occasionally. He can stand and/or walk for a total of 3 hours of an 8-hour workday. He can sit for a total of 6 hours of an 8-hour workday. He would require a sit/stand option such that after standing or walking for 30 minutes at a time, he would need to sit. He could sit up to 2 hours at a time. He can never reach overhead with the right or the left. He can reach in all other directions, handle, finger, feel, push, or pull frequently. He can never operate foot controls with the right lower extremity (but no left limitation). He can climb ramps and stairs occasionally but can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, or kneel but never crouch, or crawl. He can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle as part of the employment. He must avoid concentrated exposure (i.e., no greater than occasional or incidental contact) to extreme cold, vibration, extreme heat. He is limited to moderate noise levels, such as in an office. He is limited to simple, routine, repetitive tasks but not at a production rate. He is limited to simple, work-related decisions in utilizing judgment and dealing with

**MEMORANDUM DECISION AND ORDER – 6**

changes in work setting. He could occasionally interact and respond appropriately to supervisors, coworkers, and members of the general public. With coworkers, his employment could not require teamwork to complete jobs. With members of the public, this contact could not be required as part of work duties but could be incidental and no greater than at the occasional level. He would be off task up to 10% of an 8-hour workday. He would be absent from work one day per month.

(AR 697.)  Based on this RFC, the ALJ further found that Petitioner was unable to perform any

past relevant work.  (AR 707–708.)

In the fifth and final step, if it has been established that a claimant can no longer perform

past relevant work because of his impairments, the burden shifts to the Commissioner to show

that the claimant retains the ability to do alternate work and to demonstrate that such alternate

work exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Garrison v. Colvin,* 759 F.3d 995, 1011 (9th

Cir. 2014).  If the claimant can do such other work, he is not disabled; if the claimant cannot do

other work and meets the duration requirement, he is disabled.

Here, the ALJ found that "using the Medical-Vocational Rules as a framework supports a

finding that the claimant is 'not disabled.'"  (AR 708.)  He further found that Petitioner's RFC

was compatible with work as an "electrode cleaner," "electronic inspector," and "copy machine

operator," and that such jobs exist in significant numbers in the national economy.  (AR 709.)

Based on the finding that Petitioner could perform jobs that exist in significant numbers

in the national economy, the ALJ ultimately concluded that Petitioner "has not been under a

disability, as defined in the Social Security Act," from the alleged onset date through the date of

the ALJ's decision.  (AR 709.)

## B.    Analysis

Petitioner raises three challenges to the decision.  First, he argues the RFC is not

supported by substantial evidence.  Second, he argues that Petitioner's statements were dismissed

**MEMORANDUM DECISION AND ORDER – 7**

by the ALJ without clear and convincing reasons for doing so.  Third, he argues the ALJ

improperly dismissed lay witness statements.  *See generally* Pet'r's Mem. (Dkt. 18).  Each

argument will be addressed in turn, after the Court addresses the issue of venue because

Petitioner resides outside the District of Idaho.[2]

**1.  Any objection to improper venue has been waived.**

The second sentence of Section 405(g) of Title 42 of the United States Code governs

venue in Social Security appeals:

> Such action shall be brought in the district court of the United States for the judicial
> district in which the plaintiff resides, or has his principal place of business, or, if he
> does not reside or have his principal place of business within any such judicial
> district, in the United States District Court for the District of Columbia.

For venue to be proper under the language of the statute, Petitioner must either reside or have his

principal place of business in the District.  The record indicates that Petitioner resides in Nyssa,

Oregon.  *In Forma Pauperis* Application 1 (Dkt. 3).  There is insufficient information to identify

a principal place of business.

Regardless, venue is "not a qualification upon the power of the court to adjudicate, but

[instead] a limitation designed for the convenience of the litigants, and, as such, may be waived

by them."  *Olberding v. Ill. Cent. R. Co.*, 346 U.S. 338, 340 (1953).  Consistent with this rule, the

United States Supreme Court has observed that venue under § 405(g) is "waivable by the

parties...."  *Weinberger v. Salfi*, 422 U.S. 749, 764 (1975).  A party must raise the issue of

improper venue in a Rule 12(b) motion or a responsive pleading or it waives the opportunity to

do so.  Fed. R. Civ. P. 12(g), (h); *see also* 28 U.S.C. § 1406(b) ("Nothing in this chapter shall

---

[2] The Court has received and reviewed Petitioner's recent submission of a new medical
record at Docket No. 21.  When evaluating other medical records in this case, the Court has kept
this medical record in mind for purposes of considering consistency across medical records.

**MEMORANDUM DECISION AND ORDER – 8**

impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue.").

Here, the time to contest venue, given Petitioner's residency in Oregon, came and went without objection from Respondent.  On February 4, 2019, Respondent filed an Answer admitting the jurisdictional allegations in the Petition for Review. (Dkt. 1 ¶ I.)  In addition, Respondent's memorandum opposing the Petition for Review does not mention, much less question, venue.  (Dkt. 19.)  Accordingly, Respondent waived the defense of improper venue in this case.  The Court will consider and decide this appeal on the merits.

**2.  The ALJ's RFC finding is supported by substantial evidence.**

Petitioner contends the ALJ failed to include in the RFC all of Petitioner's functional limitations.  Pet'r's Mem. 10–15 (Dkt. 18).  He refers specifically to (a) the ALJ's failure to discuss Dr. Clausel's diagnosis of Cluster B Personality Disorder; and (b) Dr. Sant's opinion Petitioner would be limited to only occasional reaching in all planes other than overhead.  *Id.*  He also argues the ALJ failed to resolve a discrepancy between his RFC and the testimony of the vocational expert.

**a.  The ALJ did not err when evaluating and applying Dr. Clausel's opinion.**

Dr. Clausel, a licensed clinical psychologist, conducted a consultative examination of Petitioner in July 2017 at the request of the Oregon Social Security Disability Determination Services office.  He conducted, or attempted to conduct, a battery of psychological tests, after which he issued a lengthy and detailed "Psychological Evaluation" containing his findings and opinions.  (AR 1417–1428.)  Soon afterwards, he also prepared a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)."  (AR 1429–1431.)

Petitioner contends that the ALJ overlooked Dr. Clausel's diagnosis of Cluster B Personality Disorder, failed to differentiate poor persistence stemming from a personality disorder from poor persistence related to a neurocognitive disorder, and then also failed to consider that Petitioner suffered from a moderate to severe personality disorder.  He also argues that Dr. Clausel's opinion was not supported by the record in that other medical sources identified a potential thought disorder or neurological damage.  Moreover, he argues that the ALJ's finding that Dr. Clausel's opinion was consistent with an investigator's report that Petitioner exaggerated a limp was improper or unsupported based on a lack of evidence as to the investigator's credentials.  Finally, he explains why the medical records in the case file are not comprehensive and he argues that they nonetheless support a diagnosis of traumatic brain injury.

None of these arguments is availing.  Dr. Clausel did not unreservedly diagnose Petitioner with Cluster B Personality Disorder.  He opined that Petitioner "showed some classic characteristics of the Cluster B Personality Disorder" and presented "with strong suggestions of significant Cluster B character pathology."  (AR 1422, 1424.)  Ultimately, Dr. Clausel's psychodiagnosis included "Suspected 301.9, Cluster B Personality Disorder, Moderate to Severe, with Borderline-Antisocial Features."  (AR 1428.)  More fundamentally, Dr. Clausel said that, based upon his observations, Petitioner has no impairment in his abilities to understand and remember simple instructions or to sustain concentration and attention, and persist.  (*Id.*)  Instead, Dr. Clausel opined, Petitioner suffers from "[s]ituational or selective impairment" of the ability to engage in appropriate social interaction.  (*Id.*)

Hence, it goes too far for Petitioner to say that the ALJ overlooked Dr. Clausel's "diagnosis."  The ALJ said that "Dr. Clausel found the claimant had some cluster personality

**MEMORANDUM DECISION AND ORDER – 10**

dynamics," (AR 704), which is consistent with Dr. Clausel's report and its references to Cluster B Personality Disorder and the Disorder's functionally limiting effects on Petitioner.

Moving on, Petitioner argues that "the ALJ failed to take into account that Petitioner suffered from a moderate to severe personality disorder," Pet'r's Mem. 12 (Dkt. 18).  However, the list of *severe* impairments the ALJ found to apply to Petitioner included "depressive, anxiety, and personality disorders."  (AR 695.)

The Court is not persuaded that the ALJ erred either by not describing more precisely whether Cluster B Personality Disorder is included within his finding of severe impairments or by failing to find Cluster B Personality Disorder is an applicable impairment at all.  As discussed above, Dr. Clausel does not specifically reach such a diagnostic conclusion.  Instead, he refers to "some classic characteristics," "strong suggestions," and a "suspected" diagnosis.  More importantly, Petitioner does not present evidence or argument that any such alleged error undermines the ALJ's findings or ultimate decision.  That is, even if Dr. Clausel diagnosed Cluster B Personality Disorder, he describes no significant functional limitations facing the Petitioner resulting from Cluster B Personality Disorder in his report.  Accordingly, Petitioner has not demonstrated prejudice or error by the lack of more detail regarding Cluster B Personality Disorder in the ALJ's decision.

Separately, Petitioner argues that his "longitudinal treatment history was not as sparse as the ALJ seemingly believed."  Pet'r's Mem. 12 (Dkt. 18).  He discusses records from four different medical sources that discuss mental and neurological findings.  He does not discuss the portions of the ALJ's decision (a decision which is notably longer and more comprehensive than many such decisions appealed to this Court) purportedly evidencing the ALJ's belief that Petitioner's mental health treatment was sparse.  Indeed, the ALJ expressly discussed some of

the records Petitioner identifies to support his argument.  Petitioner does not, however, explain why he thinks the ALJ's perspective on the scope or length of his mental treatment history are relevant or demonstrate error.

Next, Petitioner takes issue with the ALJ's reliance on Dr. Clausel's report because it was consistent with a fraud investigator's report that Petitioner exaggerated a limp.  Pet'r's Mem. 13 (Dkt. 18).  Petitioner contends the ALJ did not explain any "nexus between exaggerated mental symptoms and a limp in the face of a severe ankle injury" and, Petitioner would contend, the record says nothing about the fraud investigator's medical training or qualifications to opine on Petitioner's physical or mental health.  *Id.*

The Court finds no error in the ALJ's evaluation of whether Dr. Clausel's report was consistent with the investigator's report.  The ALJ must determine credibility, resolve conflicts in medical testimony, and resolve ambiguities.  *Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).  The ALJ did so with Dr. Clausel's report and the investigator's report because they are in harmony on the issue of the extent of Petitioner's reliance on a cane to walk.  Per the ALJ, the investigator initially observed Petitioner walk with a normal gait but, upon seeing the investigator, he began to have "an exaggerated limp" and started using his cane.[3] (AR 706.)  Dr. Clausel's observation was similar, as he reported that Petitioner "entered the room leaning heavily on a cane, with a frail, tottering gait that seemed to the examiner on casual

---

[3] The investigator observed Petitioner "walking southbound on the sidewalk… He initially was walking in a relatively normal foot passing foot gait (refer to beginning of video clip V-002), but upon observing the investigator, he began to walk with an exaggerated limp. He also started using the single-tipped aluminum cane that he held in his right hand, to assist in bearing weight for his right leg, which now appeared to bend slightly at the knee, but was visibly stiff looking. Normally a cane would be used in the opposite hand, but he was definitely bearing weight on the cane and employing to assist his ambulation, after observing the investigator." (AR 1248.)

**MEMORANDUM DECISION AND ORDER – 12**

observation to be suspicious for exaggeration," and that Petitioner "would move slowly, leaning heavily but somewhat dramatically on his cane." (AR 1421, 1423.) Thus, the ALJ did not need to explain a nexus, as Petitioner contends, between exaggerated mental symptoms and an exaggerated limp – both Dr. Clausel and the investigator discussed an exaggerated limp.

But even if Dr. Clausel had not expressed doubt as to the extent of Petitioner's need to use a cane, Dr. Clausel's report and the investigator's report both support a finding that Petitioner was malingering, which is directly relevant to his application for disability benefits.[4] Dr. Clausel's report repeatedly indicates his belief that Petitioner may have been malingering:

> "the examiner would opine, with a 99+% degree of clinical certainty, that this gentleman was attempting to malinger neurocognitive deficits because of alleged head injury." (AR 1420.)
> "Intentional malingering was strongly suspected." (AR 1421.)
> "A number of his responses were also classic near-misses, again commonly found with patients attempting to malinger." (AR 1426.)
> "rather than representing disinhibition or loss of task set, [Petitioner's responses] seemed to represent an attempt to malinger violation of task rules." (AR 1427.)
> "Formal scores on Verbal Fluency were not derived because of open resistance and suspected malingering." (AR 1427.)

Further, Dr. Clausel specifically concluded that Petitioner was malingering, albeit with the caveat that such a conclusion is "[t]o be ruled out pending further independent review of medical and psychological histories." (AR 1428.) He also expressed that:

> As a summary comment, the examiner would note that Mr. Whitcher was especially hostile, shrilly non-cooperative, and loudly protesting when presented with formal psychometrics that seemed, the examiner suspected, to present an expectation that he perform on formal psychometric tests, but without understanding exactly what information would be given away (and, per his complaints, apparently representing procedures that had shown to past examiners that he may have been malingering and/or more capable than he has represented). The strong sense was that rather than expose himself to the discovery that he would be more capable than he wanted to represent, he was either passive-aggressive or hysterically protesting and situationally-controlling when presented with these procedures.

---

[4] It is also indirectly relevant to his application, in that a finding of malingering changes the standard applicable when analyzing a claimant's own testimony, as further discussed *infra*.

**MEMORANDUM DECISION AND ORDER – 13**

(AR 1427–1428.)  The ALJ did not need to discuss any nexus between Dr. Clausel's express opinion of Petitioner's mental malingering and the investigator's report of physical malingering. On this point, the Court finds no error by the ALJ.

Next, Petitioner challenges "the ALJ's comment that there was no record of brain injury to explain Petitioner's mental health symptoms."  Pet'r's Mem. 13 (Dkt. 18).  He faults the ALJ for not acknowledging the attempts made to procure the records, which were more than 10 years old.  Finally, he points to x-rays which indicate a cervical spine fusion to support his claim of head trauma and he says that two providers had diagnosed traumatic brain injury.

Petitioner thus frames this issue as an absence of evidence, but the ALJ's decision and the record do address this issue.  The ALJ specifically said "imaging does not show residual effects of brain trauma," citing a record from *January 2016* which stated that Petitioner's "EEG was negative and MRI of the brain was normal."  (AR 698, 1273 (emphasis added).)  Thus, Petitioner was not faulted for failing to produce medical records related to his 1996 injury; rather, the ALJ reviewed the available medical records and found that recent imaging did not support the condition Petitioner alleged.  The ALJ then appropriately followed the sequential process for Social Security cases, resulting in a finding that Petitioner's alleged traumatic brain injury does not preclude him from work in the national economy.

Further, the medical records Petitioner cites did not unequivocally reflect a diagnosis of traumatic brain injury.  In April 2013, Dr. Mosada listed "impaired cognition" and "traumatic brain injury" under a heading labeled "Assessment."  (AR 652.)  But this was Dr. Mosada's first visit with Petitioner and the "Nurse Comments" on the medical record say "Patient states he has been having memory issues, lack of coordination, agitation, anxiety and depression since 1996 after his traumatic brain injury in 1996. All of his symptoms have been progressing since then.

**MEMORANDUM DECISION AND ORDER – 14**

No recent testings."  (AR 650.)  Dr. Mosada performed a routine neurological examination, but she said "there are no imaging studies available for my review."  (AR 651.)  She also stated that the purpose of Petitioner's visit was "known history of brain trauma."  (*Id.*)  She did not recommend neurological treatment.  (*Id.*)  Her notes do not contain a diagnosis of traumatic brain injury.  Rather, she merely recorded faithfully Petitioner's report of a history or prior diagnosis of traumatic brain injury.

Petitioner also refers to Dr. Giridhar's records, who he saw in February 2013, as containing a diagnosis of traumatic brain injury.  But those records also only discuss Petitioner's reported history of traumatic brain injury, with nothing to support Petitioner's contention that Dr. Giridhar made or substantiated such a diagnosis.

Regardless, even if there were one or both such purported diagnoses, Petitioner does not show how the ALJ erred by not crediting any such diagnosis.  He has not shown how a recent, credible diagnosis of traumatic brain injury in his case would evidence a severe impairment that meets or equals one of the listed impairments leading to an automatic finding of disability.  Nor has he shown how any alleged traumatic brain injury functionally limits him to an extent that he is incapable of work in the national economy.

Therefore, Petitioner has not shown the ALJ erred in his treatment of Dr. Clausel's opinion.

### b.  There was no error in the evaluation and application of Dr. Sant's opinions.

Next, Petitioner argues the ALJ erred by giving "some significant weight" to one of Dr. Sant's opinions but then failing to include a reaching restriction consistent with such opinion in Petitioner's RFC.  Pet'r's Mem. 13–15 (Dkt. 18).  Petitioner says the ALJ did not explain why his RFC finding was less restrictive than Dr. Sant's opinion, and he says the vocational expert's

**MEMORANDUM DECISION AND ORDER – 15**

testimony at the hearing indicates the jobs the ALJ listed are precluded with the reaching restrictions Dr. Sant opined.  Petitioner also contends that if he must use a cane while standing, as per Dr. Sant's opinion, the listed jobs are again precluded.  An ALJ may reject a contradicted medical opinion by providing "specific and legitimate" reasons, supported by substantial evidence, for doing so.  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The RFC finding was that Petitioner "can never reach overhead with the right or the left" but that "[h]e can reach in all other directions, handle, finger, feel push, or pull frequently."  (AR 697.)  The RFC finding did not discuss the use of a cane.  As to physical standing, the ALJ found that Petitioner "can stand and/or walk for a total of 3 hours of an 8-hour workday…. He would require a sit/stand option such that after standing or walking for 30 minutes at a time, he would need to sit."  (*Id.*)

Dr. Sant performed consultative examinations of Petitioner in 2015 and 2017.  His 2017 opinion was that Petitioner could sit for two hours at a time and stand or walk for 30 minutes at a time, for a total of six hours sitting, two hours standing, and one hour walking in an eight-hour day.  (AR 1402.)  He further opined that Petitioner's use of a cane is medically necessary and he cannot ambulate without a cane.  (*Id.*)  However, he also opined that while using a cane Petitioner can use his free hand to carry small objects.  (*Id.*)

As to reaching limitations, Dr. Sant opined that Petitioner could never reach overhead with his right hand, but he could reach overhead with his left hand occasionally and he could reach in all other directions with either hand occasionally.  (AR 1403.)  He supported these opinions with a detailed write-up of his examination of Petitioner which describes, among other things, an MRI of Petitioner's left shoulder leading Dr. Sant to be "[h]ighly suspicious for SLAP

[superior labrum extending posterior] tear." (AR 1408.) He noted Petitioner's range of motion in both shoulders: "[s]elf-limited to 70 degrees of flexion and abduction on the right, 90 degrees of abduction and flexion on the left with subjective discomfort and submaximal effort." (AR 1410.) He also documented 4/5 strength and positive pain behavior on both sides for Petitioner's shoulder abduction, shoulder internal rotation, and shoulder external rotation. (AR 1412.) Dr. Sant noted Petitioner "has evidence of some underlying pathology on his shoulder MRI, as it had previous surgeries as have been documented." (AR 1413.) When describing Petitioner's activity limitations in text rather than in a chart, Dr. Sant opined that Petitioner "appears to be able to walk short functional distances with the use of a single point cane, though he uses the cane incorrectly…. With regard to the upper limbs, because of his previous shoulder injuries, he would have difficulty reaching above shoulder level." (AR 1413–1414.) Thus, Dr. Sant's opinion was thorough and well-supported by objective medical signs.

In weighing Dr. Sant's 2017 opinion, the ALJ considered the specific references to Petitioner's "submaximal effort and self-limitation" as well as "pain amplification behaviors and a frequent stutter, which appeared to be volitional." (AR 705.) He made note that Dr. Sant's "recommendations are based on a thorough examination and are generally supported by the claimant's surgical history and imaging." (AR 706.) However, the ALJ also repeated Dr. Sant's observation that at several times Petitioner gave "submaximal effort" and he pointed out that Dr. Sant was "not aware of some of the records pointing to the claimant's malingering." (*Id.*) Summing up his weighing of Dr. Sant's 2017 opinion, the ALJ said Dr. Sant "adopts many similar restrictions in the residual functional capacity (although the checkboxes he uses regarding postural activities are somewhat inconsistent with his report and the medical evidence of record

generally, such as saying he could occasionally kneel or crawl but never stoop or crouch.)." (*Id.*) The ALJ gave the opinion "some significant weight." (*Id.*)

In this setting, the ALJ did not err in his decision regarding the reaching limitations in Petitioner's RFC. Although Dr. Sant opined that Petitioner can reach in directions other than overhead only occasionally, the ALJ found he could do so frequently. (AR 1403, 697.) Petitioner contends the ALJ "provided no explanation why his RFC contained less severe limitations regarding the ability to reach" (Pet'r's Mem. 14 (Dkt. 18), but the ALJ explained that his decision on the weight to give Dr. Sant's opinion was because of Petitioner's pain behaviors and submaximal efforts (as described from Dr. Sant's examination), because Dr. Sant did not have some records showing malingering, and because of some inconsistencies in Dr. Sant's opinions and the overall record. In one specific area, the ALJ also referred expressly to the statement in Dr. Sant's notes that the results of Petitioner's shoulder range of motion test (which bears directly on his ability to reach) was "self-limited." (AR 705.) These are specific and legitimate reasons for not fully crediting Dr. Sant's opinions.

Nor is the Court persuaded by Petitioner's argument that "when Petitioner must use a cane when standing, as per Dr. Sant's opinion (Tr. 1402), such that one hand is always occupied, the available jobs stated by the VE were precluded." Pet'r's Mem. 14 (Dkt. 18). At the hearing, Petitioner's counsel asked the vocational expert to assume that "when in the standing position, the individual would be using a cane such that one upper extremity would not be in use. Would … those jobs still be available?" (AR 755.) The vocational expert replied, "No. If they're only able to use one hand when standing, no." (*Id.*)

The ALJ, however, did not find in his RFC that Petitioner was limited such that he must use a cane, so the hypothetical limitation counsel presented is not particularly relevant. It is true

**MEMORANDUM DECISION AND ORDER – 18**

that Dr. Sant opined Petitioner requires the use of a cane, and it is also true that the ALJ gave the opinion "some significant weight."  The ALJ did not expressly address Dr. Sant's opinion as to the medical necessity of a cane; however, the ALJ did address at length the topic of Petitioner's cane and his need for it.  He referenced Dr. Clausel's observation that the Petitioner was "quite muscular and tanned, suggesting exercise and time outdoors, and that his use of a cane and limp appeared exaggerated."  (AR 701.)  The ALJ specifically referred to the notes of the fraud investigator who said that after he had been observed by the Petitioner, the Petitioner "began to have 'an exaggerated limp' and *started* using his cane."  (AR 706 (emphasis added).)  Perhaps the ALJ could have included more connected detail about his rejection of Dr. Sant's opinion regarding the medical necessity of Petitioner's cane, but the connection is nonetheless apparent in the ALJ's references to the use of the cane and whether it was needed or not that are found in his written decision, the clear import of which is well supported by the decision.  There is more than enough specific and legitimate reasoning to support the weight he gave Dr. Sant's opinion. Petitioner has not shown error in this regard.

### c.   There was no error in the ALJ's finding that Petitioner is capable of "light work" with additional limitations.

Petitioner also alleges error in the finding that he is capable of light work rather than sedentary work, given that his standing, walking, and carrying limitations are more restrictive than the Social Security definition of "light work."  Pet'r's Mem. 14 (Dkt. 18).  Petitioner argues that given the functional limitations the ALJ found, he should have been found capable of only sedentary work.[5]

---

[5] Although Petitioner does not argue the point, presumably his position is that under the so-called "Grid Rules," a finding of sedentary work would have resulted in an automatic finding of disability in his case.

**MEMORANDUM DECISION AND ORDER – 19**

The ALJ found Petitioner capable of "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift, carry, push, or pull less than 10 pounds frequently and 20 pounds occasionally. He can stand and/or walk for a total of 3 hours of an 8-hour workday…."  (AR 697.)  As the ALJ indicated, the categories of physical exertion requirements are defined in Social Security regulations:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567, 416.967.  These definitions are clarified in Social Security Ruling 83-10, which states that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  1983 WL 31251.

Petitioner's argument is that the ALJ's RFC finding of "light work" is not supported by substantial evidence because SSR 83-10 requires 6 hours of standing or walking to meet the definition of light work, while the ALJ found Petitioner capable of only 3 hours of standing or walking.  He assigns error to the ALJ's failure to recognize and resolve this discrepancy.

The clarification provided in SSR 83-10 applies to "the full range of light work" rather than to all findings of light work.  Here, the ALJ did not find Petitioner capable of the full range

**MEMORANDUM DECISION AND ORDER – 20**

of light work, as there were limitations inconsistent with the full range of light work.  Thus, limiting Petitioner to only 3 hours of standing or walking is inconsistent with "the full range of light work" but it is not inconsistent with "light work."

A finding of sedentary work, as Petitioner seems to urge, would have been inconsistent with the specific functional limitations the ALJ found.  The ALJ found Petitioner could "lift … 20 pounds occasionally," AR 697, but, by definition, "[s]edentary work involves lifting no more than 10 pounds at a time."  20 C.F.R. §§ 404.1567, 416.967.  Thus, Petitioner's RFC exceeds sedentary work.

Petitioner did not initially frame this issue in express terms of whether the ALJ erred by misapplying the "grid framework" to place him in the light work exertional category.  Respondent did draw upon that frame, which Petitioner then adopted in his reply memorandum.  Respondent contends that the ALJ found Petitioner could perform most of the exertional demands of light work, but his standing/walking capacity was more limited than the light work definition.  Resp't's Mem. 12 (Dkt. 19).  Accordingly, says Respondent, Petitioner's RFC fell between the light and sedentary exertional levels and the ALJ rationally and appropriately relied on the vocational expert's testimony to guide his assessment of whether Petitioner's RFC was consistent with working in the national economy.  *Id.*  Respondent then points to three light occupations identified by the vocational expert as occupations Petitioner could perform and contends further that Petitioner has not argued the occupations exceed his abilities.  *Id.*

In reply, Petitioner argues that "reliance on the grids in this case was not appropriate." Pet'r's Reply 6 (Dkt. 20).  The ALJ did not rely on the grids.  Rather, he gathered extensive testimony from the vocational expert at the hearing (AR 746–753) that was supplemented by questioning from Petitioner's counsel (AR 753–759), which he relied on to make his finding of

Petitioner's capacity to work in the national economy.  Petitioner reiterates his argument that the ALJ erred by failing to recognize and resolve a discrepancy between his RFC finding and the vocational expert's response that Petitioner could work at light levels but only stand and walk three hours per day.  Pet'r's Reply 6–7 (Dkt. 20).  But there was no such discrepancy, as has already been discussed.  Thus, the ALJ did not err in finding Petitioner capable of light work with additional limitations.

**3.   There was no error in the ALJ's treatment of Petitioner's statements.**

Petitioner contends the ALJ discredited Petitioner's testimony as to the severity of Petitioner's impairments "without providing clear and convincing reasons for doing so."  Pet'r's Mem. 15 (Dkt. 18).  Petitioner describes a two-step process by which a claimant's testimony regarding subjective symptoms is analyzed, which first calls for the ALJ to decide whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.  *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–1036 (9th Cir. 2007)).  The ALJ here found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the evidence."  (AR 699.)

Petitioner contends that "[i]f the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so."  Pet'r's Mem. 15 (Dkt. 18) (citing *Trevizo v. Berryhill*, 862 F.3d 987 (9th Cir. 2017) (opinion amended and superseded on denial of rehearing by *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017)). Stating the same proposition but citing different case law, Respondent contends that an "ALJ

must provide clear and convincing reasons to reject a claimant's testimony unless 'there is affirmative evidence that the claimant is malingering.'"  Resp't's Mem. 3 (Dkt. 19) (quoting *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008)).

Petitioner provides several pages of argument explaining how he thinks the ALJ failed to provide clear and convincing reasons for dismissing his testimony.  Pet'r's Mem. 15–17 (Dkt. 18).  But, the threshold of that argument is not reached on this record because there is affirmative evidence of malingering and therefore the "clear and convincing" standard does not apply.  As discussed at length *supra*, a fraud investigator observed Petitioner "walking in a relatively normal foot passing foot gait… but upon observing the investigator, he began to walk with an exaggerated limp" and Dr. Clausel repeatedly described Petitioner as malingering or exaggerating symptoms, even going so far as to diagnose Petitioner with malingering.  (AR 1248, 1428.)  In addition to this evidence, the ALJ drew upon the evidence that when Petitioner established care with a mental health clinic in January 2015, the clinician observed his symptoms may have been volitional:

> [Petitioner] will act confused, stop in mid-sentence and then come back to where he was and finish his sentence. (This does appear planned) (He did not allow the M.A. to put him in a room, but he did tell her that he was involved in an accident and that he has been faking everything since then???)

(AR 702, 1232.)

Thus, the ALJ cited affirmative evidence of malingering in the record.  Having done so, he was not obligated to provide clear and convincing evidence when discounting Petitioner's testimony regarding the severity of his subjective symptoms.

Petitioner points out that the ALJ did not expressly state malingering was a reason to discredit his testimony and refers to some objective medical evidence which Petitioner contends was consistent with his reports of ankle, shoulder, and back pain.  The ALJ did not, contends

**MEMORANDUM DECISION AND ORDER – 23**

Petitioner, explain how certain objective evidence conflicted with Petitioner's reports of pain. Pet'r's Reply 2 (Dkt. 20). Such a framing of the issues, however, does not contain the standard required of the ALJ. It is the ALJ's duty to resolve conflicts in the record, but not every conflict must be explained to a claimant's satisfaction. Moreover, the precise issue is not whether Petitioner's subjective reports of pain were consistent with *any* medical evidence; rather, the issue is whether the manner in which the ALJ reached his assessment of Petitioner's subjective testimony complied with the applicable standard and was supported by substantial evidence. It did, and it was.

Petitioner then argues that the ALJ never referenced exaggeration of symptoms or malingering. But the ALJ did refer to the fraud investigator's observation of an exaggerated limp and he referred to Dr. Sant's observation that Petitioner's "spine and right shoulder range of motion were self-limited." (AR 705.) He also referred to a medical record documenting an apparent admission by Petitioner "that he has been faking everything." (AR 702, 1232.) These are express references to exaggeration of symptoms or malingering.

In light of substantial independent evidence of malingering found in multiple points of the record, the Court is not persuaded that the ALJ was required to provide clear and convincing reasons to discount Petitioner's testimony, or that, if required, the reasons he provided were not clear and convincing. The ALJ did not err in his treatment of Petitioner's testimony.

**4. There is no error in the ALJ's treatment of lay witness statements.**

Finally, Petitioner contends the ALJ erred by improperly discounting the testimony of certain lay witnesses, including Petitioner's instructors and tutors as well as a "clinical specialist" with unknown credentials. Pet'r's Mem. 17–20 (Dkt. 18). An ALJ may dismiss the testimony of

**MEMORANDUM DECISION AND ORDER – 24**

lay witnesses only by giving reasons germane to each witness.  *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).

Petitioner argues the ALJ failed to give a germane reason to discount his theater professor's statements when the ALJ's remarks contained an obvious inconsistency.  The ALJ said Petitioner's theater studies professor:

> [A]ccommodated the claimant by giving copies of notes, and commented the claimant 'showed great work ethic and an eagerness that is uncommon amongst students' but had excessive absences. This also shows good persistence and does not document debilitating mental problems for simple, routine, repetitive tasks as included in the residual functional capacity.

(AR 699.)  Petitioner frames "excessive absences" as inconsistent with "good persistence" and he notes that absences totaling more than one day per month is work preclusive.  Pet'r's Reply 18 (Dkt. 18).  But he does not explain why a reference to "persistence" in context refers to attendance rather than to the evaluation of mental impairments, which requires an ALJ to rate a claimant's degree of functional limitation in four broad functional areas, one of which is the ability to "concentrate, persist, or maintain pace."  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  Nor does an unspecific reference to "excessive absences" in an academic context necessarily mean that there was more than one absence a month.  The Court acknowledges that there could have been more than one absence a month, but more importantly, the possibility of more than one absence a month does not obviate the other, more specific references, relied upon by the ALJ – that of "a great work ethic and eagerness that is uncommon amongst students."

More fundamentally, however, even if the Court were persuaded the ALJ's specific reasons for discounting the theater professor's testimony were not germane, the ALJ offered additional, more general, reasons that did satisfy the "germane reasons" standard.  The ALJ gave

the non-medical statements of Petitioner's professors and other administrators "some weight."

(AR 699.)  After speaking to some specific opinions by these lay witnesses, the ALJ summed up:

> Because these educators did not have medical or vocational expertise and did not
> address function-by-function limitations with particularity, the undersigned does
> not give them great weight. Their descriptions are based on some first-hand
> observation, so they are helpful and merit some weight. Overall, the statements
> describe only moderate impairments and support capacity for some simple work
> tasks and decisions.

(*Id.*)  Thus, the ALJ listed several germane reasons for his weighing of such lay testimony: The

witnesses lacked appropriate expertise, they did not describe specific functional limitations, and

they did not describe more than moderate impairments -- sufficient germane reasons to support

his treatment of the theater professor's testimony.

Petitioner also challenges the ALJ's statement that Petitioner "had accommodations for

alternative testing – time and a half – to allow for less distraction."  (*Id.*)  Petitioner argues that

Social Security regulations do not take into account the possibility of reasonable

accommodations in determining disability eligibility, and extra testing time is akin to a

workplace accommodation.  Pet'r's Reply 19 (Dkt. 18).  Thus, he argues, referencing an

academic accommodation cannot be a germane reason to dismiss this lay witness's testimony.

Regardless of whether the ALJ's reference to extra testing time fails to meet the

"germane reasons" standard, Petitioner cannot prevail on this issue because of the other germane

reasons the ALJ identified, as discussed previously.

Finally, Petitioner challenges the ALJ's discounting of the opinion of Ms. Cochran, a

"clinical specialist." The ALJ said that Ms. Cochran "opined the claimant had issues with

irritability, interpreting the behaviors of others, oversensitivity, attention and concentration,

memory loss, anxiety and depression."  (AR 702).  He gave her opinion "little weight" because

"[it] is not supported by objective findings and is based on a limited treatment relationship. It is

**MEMORANDUM DECISION AND ORDER – 26**

unclear what experience in treating or what professional insight Ms. Cochran has as a 'clinical specialist;' she is not an acceptable medical source." (*Id.*)

Petitioner argues that Ms. Cochran's observations were consistent with those of other clinicians who treated him, including Dr. Nash and Susanna Darr, APRN. He further argues that Ms. Cochran treated him at least three times, undermining the ALJ's reference to a "limited treatment relationship." Finally, he argues that Ms. Cochran properly reported her observations of Petitioner's behavior based on her training as a mental health professional, but he does not explain Ms. Cochran's education, training, or credentials.

In response, Respondent says that Petitioner appears to have seen Ms. Cochran only two times before the date she wrote her letter and, even then, the second visit was interrupted when Petitioner left therapy against medical advice. Respondent also contends that the objective evidence does not support that Petitioner had a head injury that caused him cognitive difficulties, which is consistent with other medical records.

Measured against those details, the ALJ did provide germane reasons for discounting Ms. Cochran's testimony. Most significantly, Petitioner has not clarified Ms. Cochran's role or qualifications to offer the opinions she did. Discounting her testimony based on the lack of a clearer understanding of her background or relationship with Petitioner was a germane reason. Further, the fact that Ms. Cochran only saw Petitioner on two occasions, including one session that Petitioner himself cut short, is a germane reason for discounting her opinion.

## IV. <u>CONCLUSION</u>

The ALJ has not committed reversible legal error regarding the RFC finding, the weighing of Petitioner's testimony, or the weighing of lay testimony. Accordingly, the ALJ's

decision is supported by substantial evidence and it will be upheld.  Petitioner's Petition for Review will be denied.

## V. **ORDER**

Based on the foregoing, Petitioner's Petition for Review (Dkt. 1) is **DENIED,** the decision of the Commissioner is **AFFIRMED,** and this action is **DISMISSED** in its entirety, with prejudice.

DATED: May 27, 2020

Honorable Ronald E. Bush
Chief U.S. Magistrate Judge